Thurman, J.
It is agreed, upon both sides, that the indictment, is framed upon section 17 of the “ crimes act,” and not upon the 24th. Mr. Attorney-General, in his brief, says : “ The indictment does not charge the crime of maliciously shooting at the prosecutor with intent to kill, etc., under section 24. It is tr'ue the-words ‘ shoot at’ occur in it, but it does not allege that the shooting was malicious, the very gist of the offense; it does not aver the weapon discharged, nor that it was loaded: all of which are-necessary to a count under this section. See the form, Archbold, 428, old ed.” This may be correct. We do not say that it is not. But if it be granted that the indictment is upon section 17, a very grave question arises, namely, was the prisoner properly indicted ?' The facts which the testimony tended to prove are set out in the bill of exceptions, by which it appears that the only assault made was by shooting with a pistol. There was no assault independent of the *shot. Does such a case fall under section 17 ? That section is in these words: “ That if any person shall assault another with intent to commit a murder, rape, or robbery upon the person so assaulted, every person so offending shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be imprisoned in the penitentiary, and kept at hard labor, not more-than seven nor less than three years.”
There is no doubt that the case comes within the letter of this-section, but we must, if possible, find the legislative intent, to do-which other parts of the act must be considered. 1 Turning, then, to-section 24, we see it provided: “That if any person shall maliciously shoot, stab, or shoot at any other person, with intent to kill, wound, or maim such person, every person so offending shall be-deemed guilty of a misdemeanor, and, upon conviction thereof, shall be imprisoned in the penitentiary, and kept at hard labor, not. more than twenty years nor less than one year.” It is very clear that this section also, in its terms, embraces the case. It has, in *446 ■deed, been suggested, that section 17 was designed for cases in which, if death had resulted, the crime would have been murder in the first degree, and section 24 for those cases in which the killing would be only murder in the second degree. I must say that this seems a strange construction to me. It makes the legislature provide a punishment of twenty years’ imprisonment for the lessor offense, and only seven years for the greater. And it is directly opposed to_thc case of Sharp v. The State, 19 Ohio, B86, in which it was held that there might be a conviction under section 17, although, had death resulted, the crime would have been but murder in the second degree. Malice is a necessary ingredient of the offense under either section, for there can be no conviction under either, savo of an assault, or an assault and battery, if the crime would have been merely manslaughter in the event of death.
As, then, each section, in terms, embraces the case under consideration, the question is presented, was it the intention of the lawmakers that the prisoner might bo prosecuted *under either section, at the option of the grand jury, or the attorney for the state, or was it meant that the indictment should be upon section 24 alone, when the shooting, or stabbing, was the only assault committed ? It would certainly be somewhat strange if such a discretion was vested in a grand jury, or a prosecuting attorney, and would open a wide door to partiality, or persecution, and render the punishment of crime not a little uncertain. If the indictment may be under either section, then, by selecting the 17th, the accused, if found guilty, must be imprisoned for at least three years, however much his case may appeal to the clemency of the court; whereas, wore he indicted under the 24th, he might be imprisoned for one year only. On the other hand, if prosecuted under the latter section, he might be confined for twenty years, but if under the former, for not over seven, however heinous his crime might be. Now, is it probable that the legislature enacted two sections, with such different penalties, for the same offense, and left it to the discretion, partiality, or prejudice of a grand jury, or prosecuting attorney, to decide under which section to indict ? Is it not much .more reasonable to suppose that, regarding the use of a fire-arm, a knife, or similar weapon as a more dangerous offense than an assault with a blud.geon, or the like, and knowing it to be a crime of frequent occurrence and therefore requiring severe repression, section 24, with its '/maximum penalty of twenty years’ imprisonment, was enacted to *447 •repress it, while for assaults not so likely to prove fatal, section 17, with its maximum of seven years’ imprisonment, was adopted ? And that the minimum penalty is less in the former than in the latter, is owing to the fact that the former includes cases in which the intent is merely to wound or maim. Again, it was distinctly decided, in Wilson v. The State, 20 Ohio, 26, that these two sections define “ distinct and independent offenses.” For these reasons, and others that might be mentioned, it would probably be correct to hold that the case under consideration does not fall under section 17, or, in other words, that, as there was no assault independent *of the shooting, the prisoner could properly be indicted under section 24 alone. But this view of the case has not been argued. The counsel on neither side have presented it, and there is another ground upon which the judgment must be reversed. We therefore think it best to leave it open for further consideration.
The prosecuting witness, Holcomb, was fired upon about half-past ten o’clock at night. He wTas standing in the parlor of a tavern and near a window, which is described in the bill of exceptions as a “common glass window.” The sash was down, so that to see an object on the outside, it was necessary to look through the glass. The person firing stood on the outside, at a short distance, not over a few feet from the window. To prove his identity, there was no testimony but Holcomb’s. He swore that while stooping to take up his books from a table close by the window, he turned his face and looked toward the left, at or out of the window, and saw a man outside, within one or two feet of, or near, the window, who, he thought, was the defendant, with his arm extended, and a pistol in his hand pointed toward the witness; that, at the same instant, the pistol was discharged directly toward him, and that, by the flash of the discharge, he distinctly saw and recognized the prisoner; “that he then saw his eyes, nose, and white teeth, and that he was as certain of that as he was of anything under heaven.” He further testified that he was, at the time of the occurrence, and had been for a long time, greatly in fear of the prisoner; that he feared the prisoner would shoot him or harm him; and that he even feared to go out of the house that night for that reason.
The state also produced and examined several witnesses, who were not present at the shooting, to prove experiments and observations subsequently made by them at the tavern, under circum *448 stances as to light, position, firing with a pistol, etc., like those that, existed when Holcomb was shot at, and also their opinions of the-results, “ for the purpose of proving by inferences, from such ex-perimcnts and observations, *of the light within, the darkness-without, the firing of a pistol, etc., that the said Holcomb might or-could have seen and known the said defendant under these circumstances and in the manner related by him;” some of which experiments were made during the progress of the trial.
The prosecution having rested in chief, thereupon, states the bill', of exceptions, “the defendant, among other evidence to maintain the issue on his part, offered to prove that, since the filing of this-indictment, the witnesses offered had, at another place than that where the crime was committed, tried experiments as near as possible to those stated above, of looking through a glass window at a person on the outside of the window, and at various distances, varying from two to fifteen feet therefrom, while a candle was burning in the room, where the witness was in such a position as to reflect its light through the window and toward the place where the person on the outside of the window stood, and that while the witness was so looking through the window, the person being outside, and looked at, fired off a pistol directed toward the witness looking out through the window, and that the witness, though ho could see the-person on the outside, could not distinguish and identify him; and that the flash or light from the firing of the pistol did not enable-the witness to distinguish the person being looked at; nor did the light from the firing of the pistol aid his vision or enable him to-see anymore clearly or distinctly such outside person than ho could before said pistol was fired. To the admission of which testimony, the state, by her attorney, objected; and said objection was so far-sustained as to rule out said detail of facts; while the witness, as-an expert, was permitted to state whether he was acquainted with the laws of light and vision, and, if so acquainted, to state his-opinion as to the effect -of a sudden light, like that made by the firing of a gun or pistol on one’s vision, and whether it will, or will, not, aid one looking at a person or object, in the night and darkness, in distinguishing or seeing more clearly the person or object looked at. To which ruling of the court the said defendant excepted.”
*"We are unanimously of opinion that, in rejecting the testimony offered as above, the court erred. Holcomb had sworn that. *449 he distinctly recognized the prisoner by the flash of the discharge of the pistol. This was a most material statement. 'Without it, there was no pretense of sufficient evidence to convict. Now, it was certainly lawful to disprove this statement, by showing the impossibility, or natural improbability, of its being true. This is not denied, but it is said that it could not be done by proof of experiments. If not, how could the proof be made? No one but Holcomb was looking through the window when the crime was committed. No one but he saw the pistol fired, or the person who fired it. Direct contradiction, by eye-witnesses of the transaction, was therefore impossible, and would perhaps be equally impossible in a largo majority of like cases. "Unless, then, proof of experiments is receivable, a man is very much at the mercy of another, who swears against him, and perjury or mistake, however great, instead of incurring punishment, or being rectified, may answer to produce conviction. But it is said that the proper rebutting proof would be the opinions of “ experts,” to use the language of the bill of exceptions. Now, I apprehend, that the firing of a pistol in a man’s face, at the distance of a few feet, is not quite so common an occurrence as to have raised up a class of “ experts,” whose acquaintance “with the laws of light and vision” makes their opinion, in a case like the present, the , only competent testimony, or gives to such opinions any jirefcrence over the proof of facts. It requires no^ scientific witness to toll a jury whether he saw the eyes, and nose, and white of the teeth, of a man who shot at him, by the flash of the pistol that he fired. And proof that a number of men, of ordinary powers of vision, have tried the experiment, and found themselves unable thus to distinguish countenances—found that their vision was not thereby aided at all—is evidence entitled to as much, if not more, weight, than the opinions of scientific men can be; for the question whether a face can be thus told, is merely one of fact, *and not one of science; and any man, whether learned or unlearned, after hearing the proofs, can decide with reasonable certainty upon its probability. If a man were to swear that he distinguished the color of another’s eyes, at the distance of a hundred yards, could his statement be disproved only by the opinion of some one skilled in the “laws of vision?” Or, if he should testify that, with a lever of a given length, he moved a certain weight, would it be necessary, in order to contradict him, to call a witness able to talk learnedly of the vis inertice of matter and the laws of mechanical *450 ■forces ? Might not experiments made by unlearned men, with such an instrument, be quite satisfactory?
But, say counsel, all these experiments are res inter alios acta. And pray, lot me ask, what are the opinions of scientific men but conclusions formed upon experiments that are equally res inter alios?
Again, it is urged that the experiments in question were not made by looking through the same window-pane that Holcomb looked through. But does that deprive them of all value? Is there such a difference, in common window-glass, that the judgment could not, in any degree, be aided by an experiment made with another pane? -Suppose that scientific men had been called to give their opinions, as the court ruled was proper, would all of them have been set aside who had not experimented at that identical window? Or, suppose that that particular pane had been wholly destroyed by the shot, would it follow that no experiments could be made at all?
It is also argued that the state can not come prepared to meet proofs of facts that are not a part of the res gestee. But the credibility of testimony is always in issue, and the state must come prepared to maintain the credibility of hers; and it would be a much greater hardship upon a defendant, to require him to produce scientific men to give their opinions, when such men are, in most places, so scarce, than to compel the state to anticipate that equally ■cogent proof will be given.
^Finally, it is said that, notwithstanding the results of the experiments, it is possible that Holcomb saw what he said he did. 'Granted, but what of that ? It was not indispensable to the defense to prove the utter impossibility of his narration. Evidence that tended to show its improbability, was competent; and such evi•dence, if it did not convince, might, at least, have raised a reasonable doubt in the minds of the jury. And there was the more ground for supposing that it would do so, when coupled with facts to which Holcomb himself testified. He was in great fear of the prisoner, and had been for a long time. He apprehended that his life would be attempted, and so much was his imagination oppressed with this idea, on the night he was shot at, that he feared to leave -the house even for a moment. While in this state of mind he was fired upon. He saw, or imagined he saw, the lineaments of his enemy in the face of the person who fired. It may be that he did, 'but, whether he did or not, nothing could be more natural than for '■Rim to suppose-so. That he intended to testify truly may well *451 enough be admitted, but that, under the circumstances, he was liable to be mistaken, is very evident. The evidence offered tended to prove that he was mistaken, and though, for aught we know, it may have been entitled to but little weight, it was competent and should have gone to the jury for their consideration.

Judgment reversed.